UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| vs. | ) | Case No. S1-4:09CR0485 DJS (AGF) |
| JAMES PATRICK GRADY, | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motions filed by Defendant, James Patrick Grady. Defendant is charged in a four count superseding indictment with attempted sex trafficking with children in violation of 18 U.S.C. §§ 1591 and 1594(a); attempted coercion and enticement of a minor to engage in sexual activity, in violation of 18 U.S.C. § 2422; possession of child pornography, in violation of 18 U.S.C. § 2252; and criminal forfeiture. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b).

Defendant filed motions to suppress statements, physical evidence, and recorded conversations (Doc. Nos. 23, 24, 25 & 36).[1] Evidentiary hearings were held on October 14 and December 7, 2009. The United States was represented by Assistant United States Attorney Howard Marcus. Defendant was present and represented by his attorney, J.

---

[1] Defendant also filed a supplemental motion for discovery (Doc. #49), but following the hearing the parties advised the Court that this motion had been resolved.

Martin Hadican. At the initial hearing, Defendant was permitted to amend his motion to include a request to suppress certain e-mail communications for alleged violations of the Fourth Amendment and the Stored Communications Act. The United States presented the testimony of Special Agent ("SA") Cynthia Dockery, who has been an agent with the Federal Bureau of Investigation ("FBI") for nearly seven years, and is assigned to handle sex trafficking cases; and Detective Andrew P. Hrenak, who is employed with the Hazelwood Police Department, and has been an Investigator with the Regional Computer Crime Education and Enforcement Group for the past eight years. Based on the testimony and evidence adduced and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

In July 2009, members of the FBI, the St. Louis County Police Department, and the Maryland Heights Police Department were engaged in an on-going investigation of persons who seek to purchase sexual services on-line from underage girls. In connection with that investigation, the officers posted an anonymous listing on Craigslist, captioned "Two Lola's back n town." To those conversant in child pornography, a "lola" refers to an underage prostitute. The body of the listing also referred to "two Vicky's . . . Lookin to meet new men" and to "Hussyfan," terms which also reference child pornography. The advertisement had a PostingID number, and an e-mail address to which those who were interested could respond. Govt. Ex. 4.

2

On July 29, 2009, at 12:11:36 p.m., Defendant, using the address of sarkpatrick@yahoo.com, responded by sending an e-mail to the Craigslist server address listed in the advertisement (serv-ggpgp-191681318@Craigslist.org). In his response, Defendant stated: "Hi. Let me know some info. I may want to schedule a time for today." Pursuant to the protocol established by Craigslist, the response from Defendant was "re-mailed," or forwarded, to the entity that posted the ad, in this case undercover officers at the e-mail address "adamhall6720@yahoo.com." The officers received Defendant's response on the officers' own computer, and opened the e-mail. The officers responded to Defendant that there were two girls available, and from the text of the e-mail, appear to have shown him Sabrina. The officers stated that Sabrina was available for $80 for a half hour, and $160 for an hour, depending on what Defendant wanted. They also advised Defendant that "[h]er little sister" was available too. Apparently referencing "law enforcement," Defendant then responded, "I presume you are not LE? Do you have a rate for both girls? I am not L.E." The officers responded with rates for both girls, advising that the price for Katie -- the 14 year old -- was $100 for a half hour, and that the price was "300 for both of them depending on what you want." As the last line, the officers added, "No I am not L.E."

Defendant advised that he wanted Sabrina for a half hour. The officers confirmed "you want Sabrina the 16yo for hh right?" and asked what services Defendant wanted and when he wanted to do it. Defendant first stated that he wanted "just a full body massage." The officers responded, "move on then they don't massage." Defendant said

3

"OK How about some kissing with a bj?" The officers said ok and asked when. Through a series of additional e-mails, they arranged a time of 4:00, and Defendant was advised that the place would be in Lemay, in South County. The officers stated they would send Defendant a telephone number and give him directions when he called, and a few minutes later provided a telephone number. This exchange of e-mails, 16 in all, began at 12:11 p.m. and ended at 1:36 p.m. that same day.

Defendant thereafter called the telephone number provided, and a series of telephone calls followed between Defendant and an undercover officer, which calls were recorded. In the calls, Defendant was first directed to a bank parking lot, and then, as arranged, he contacted the undercover agent again. Defendant was then given specific directions to the house where he was to meet the girl, which was actually an undercover house that was wired for both audio and video recording.

At approximately 4:15 p.m. on July 29, 2009, Defendant pulled into the driveway of the undercover house, driving a blue 2007 Toyota Camry, which is the subject of the forfeiture count in the indictment. There he made contact with the undercover officer and they had further conversation, the full content of which was not described at the hearing. SA Dockery was able to hear Defendant say something like he was not comfortable with the house, that it didn't look right, and that he thought it might be law enforcement. The undercover officer responded, "No, I'm not law enforcement. You came here to meet Sabrina." He then yelled for Sabrina to get ready. Defendant apparently entered the house, and then returned to the porch outside, at which time the officer issued a pre-

4

arranged signal, and advised Defendant, "By the way, you're under arrest." The officer attempted to detain Defendant, but he pulled away. SA Dockery and SA Sorrells came outside to assist with the arrest. They were dressed in street clothes, but were wearing vests that identified them as FBI agents. They initially drew their firearms and advised Defendant that he was under arrest, but Defendant resisted their efforts to place him in handcuffs. After holstering their firearms, and they each grabbed one of Defendant's arms and placed him in handcuffs behind his back, at which time Defendant stated that he could not believe this was happening.

The officers brought Defendant inside to the living room, where he was searched. Prior to searching Defendant, they asked if he had anything on his person that could hurt them, and he responded that he had no needles and no drugs on his person. They then brought Defendant into the kitchen and seated him at the kitchen table. The handcuffs were moved to Defendant's front; for officer safety the handcuffs were not removed altogether, due to Defendant's prior efforts to resist.

SA Dockery and SA Sorrells removed their vests and sat at the table with Defendant. They then presented Defendant with an Advice of Rights form, which SA Dockery read aloud, and also permitted Defendant to read to himself. See Gov't Ex. A. Defendant placed his initials alongside each of the rights, reflecting his understanding of each. Defendant indicated that he understood his rights, agreed to speak to the agents, and executed the waiver of rights. Above his signature the form read: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to

5

answer questions without a lawyer present." The Advice of Rights form was first presented to Defendant at approximately 4:20 p.m., and was signed and witnessed at approximately 4:25 p.m. Id.

The two agents then interviewed Defendant for approximately 45 - 60 minutes. No promises or threats were made to induce Defendant to waive his rights or to make a statement, and apart from Defendant's initial arrest, the officers did not at any time display any weapons. Although she did not specifically recall doing so, SA Dockery may have advised Defendant of the type of charges he could be facing and that he could be facing a penalty of 10-15 years.

During the course of the interview, the agents, at different times, requested consent to search Defendant's cell phone, his car, his residence, and his laptop, which was located in his residence. See Gov't Exs. B-E. With regard to each search request, the agents presented Defendant with a Consent to Search form, and Defendant agreed and executed the Consent to Search form. Each form identified the item or area to be searched, and above the signature, each form stated:

> I have been advised of my right to refuse consent.
>
> I give this permission voluntarily.
>
> I authorize these agents to take any items which they determine may be related to their investigation.

In response to their questions, Defendant advised the agents that to access his computer they needed to type "amazon" and press enter. The consent to search pertaining to the computer described the computer to be searched as:

> "laptop, Toshiba, black
> located at 6047 Bishops Place, SLMO 63109
> office area"

The instructions for accessing the computer that Defendant provided are also reflected on the form. Gov't Ex. D.

At the time of these events, Defendant was 57 years old. During their discussion, the agents learned that Defendant was a parish priest in the St. Louis area, and that he had never before been arrested. No promises or threats were made to induce Defendant to provide the various oral and written consents to search, and prior to providing consent, Defendant was advised that he had the right to refuse to consent. In addition to the two agents interviewing Defendant, there were two or three additional agents and officers in the house who at times entered the kitchen and then left to conduct the searches or engage in other activities. At no time were all of the officers gathered in the kitchen area with Defendant.

Pursuant to Defendant's consent, the officers and agents searched Defendant's car and scrolled through his cell phone, but did not find or seize any evidence as a result of either search. They thereafter went to Defendant's residence, seized his laptop, and made an image of the hard drive. As alleged in the indictment, child pornography was located on the laptop. They also recovered most, but not all, of the e-mails between Defendant

7

and the undercover officer, as some had been deleted. The agents also obtained a federal search warrant directed at the sarkpatrick e-mail account at Yahoo, and again were able to recover a copy of most of the e-mails referenced above. At the hearings, Defendant represented that he is not seeking to suppress the video recording made at the undercover location, and is not challenging the search warrant directed at Yahoo.

## CONCLUSIONS OF LAW

### A. Recordings of Telephone Calls and Copies of E-mails

Defendant has moved to suppress the telephone calls that were recorded as well as the e-mails exchanged, on the ground that they were not consensually recorded. Defendant also contends that the e-mails should be suppressed because they were seized without a warrant and no exception to the warrant requirement applies; were seized in violation of the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701-2711; and were made and received in violation of Yahoo's terms of service which require true information and no impersonation of others.

Although Defendant asserts in his written motion that his telephone calls and e-mails were not consensually recorded, the Court finds no factual basis for this assertion, as one party to each of these exchanges, namely the undercover officer, agreed to record the conversations. Nor is there any legal basis for Defendant's assertion. The law is clear that no violation of the Fourth Amendment occurs where, as here, one party to telephone conversation has given consent to intercept the communication. See United States v. Carona-Chavez, 328 F.3d 974, 978 (8th Cir. 2003); United States v. Lugo-

Olivares, No. 07-323(1)(DWF/FLN), 07-323(4)(DWF/FLN), 2007 WL 4395581, at *6 (D. Minn. Dec. 13, 2007) (noting "It has been long established that a person engaged in a conversation assumes the risk that another party to the conversation might record or otherwise divulge the conversation.") (citing United States v. White, 401 U.S. 745, 752-53 (1971)); see also, United States v. Jones, 801 F.2d 304, 315 (8th Cir. 1986) (holding that no interest protected by the Fourth Amendment is involved when one party to a conversation consents to record the conversation). The same is true with respect to e-mail communications. United States v. Fuller, 77 F. App'x 371, 376 (6th Cir. 2003).

Further, the e-mail communications were not "seized" by the agents within the meaning of the Fourth Amendment, nor did Defendant have any legitimate expectation of privacy in the communications. Defendant certainly cannot assert any basis to suppress the e-mails that were created and sent by the undercover officers, and thereafter stored on their own computer. The remaining e-mails were sent by Defendant to the address provided, and the undercover officers simply received and opened them at the address to which Defendant directed them. See Guest v. Leis, 255 F.3d 325, 333 (6th Cir. 2001) (noting that e-mail senders "would lose a legitimate expectation of privacy in an e-mail that had already reached its recipient; at this moment, the e-mailer would be analogous to a letter-writer, whose expectation of privacy ordinarily terminates upon delivery of the letter") (citations omitted); see also Ideal Aerosmith, Inc. v. Acutronic USA, Inc., No. 07-1029, 2007 WL 4394447, at *5 (E.D. Pa. Dec. 13, 2007) (holding that plaintiff had no claim under the Wiretap Act against the defendant, who was not the intended recipient of

the e-mail communication, where the communication was nonetheless sent to the defendant).

Moreover, having responded to an anonymous listing, Defendant assumed the risk that the entity with whom he chose to correspond was not an actual purveyor of underage prostitutes. That the undercover agent concealed his identity and stated that he was not law enforcement does not change this result. See Lopez v. United States, 373 U.S. 427, 437-39 (1963) (holding that recorded conversation with agent who gained entry to the defendant's office by misrepresenting and falsifying the purpose of his mission, was not subject to suppression); see also Sega Enters. Ltd v. MAPHIA, 948 F. Supp 923, 930 (N.D. Cal. 1996) (recognizing that access to a public bulletin board through use of a pseudonym does not constitute an unauthorized access under the SCA, as such forums "are normally accessed by use of an alias or pseudonym").

Nor are the e-mail communications subject to suppression based upon an alleged violation of the SCA, 18 U.S.C. § 2701(a), which prohibits the unauthorized access to electronic communications obtained "while . . . in electronic storage." The SCA contains an exception for access which is authorized by a user of an electronic service with respect to a communication of or intended for that user, and for access by a "person or entity providing a wire or electronic communications service." 18 U.S.C. § 2701(c). The case law, including the Fraser case cited by Defendant, recognizes that those who "provide their employees with 'the ability to send or receive electronic communications' are 'person[s] or entit[ies] providing a wire or electronic communications service' for

10

purposes of the exemption." Sega, 2007 WL 4394447, at *6 (citing Fraser v. Nationwide Mut. Ins. Co., 352 F.3d 107 (3d Cir. 2003)). Thus, the government, as the provider of the system, and the officers, as "users" obtaining communications intended for them, would be exempt under the Act. See Fraser, 352 F.3d at 115 (holding that an employer which provided e-mail service to its employees was exempt from liability under the SCA for searching and retrieving from its system e-mails sent and received by its employee); Quon v. Arch Wireless Operating Co., 309 F. Supp. 2d 1204, 1209 (C.D. Cal. 2004) (holding that police offers were "users" under the SCA of electronic communication services (pagers) provided by the City). Further, the statute also unequivocally provides that the remedies and sanctions contained therein, namely fines, imprisonment and administrative discipline, "are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." 18 U.S.C. § 2708. Thus, the suppression of evidence seized in violation of the statute is not an authorized remedy, in any event.

Defendant's final argument, that the officers violated the terms of the Yahoo agreement by misrepresenting their identity, also fails to provide a basis for suppression of the e-mail communications under the Fourth Amendment. Even if one assumes that the officers violated the terms of their private contract with Yahoo by stating they were not "L.E.," Defendant cites no case support for his assertion that the breach of the officer's contract with Yahoo would require suppression of the e-mail communications under the Fourth Amendment. Indeed, the case law suggests just the contrary. See United States v. Caceres, 440 U.S. 741, 755 (1979) (holding that the failure of an IRS

agent to follow IRS internal electronic surveillance regulations did not require suppression of the tape recordings made in connection with the prosecution of the taxpayer for bribing an IRS agent); see also, Virginia v. Moore, 553 U.S. 164, 128 S.Ct. 1598, 1607 (2008) (holding that arrest made in violation of state law did not violate the Fourth Amendment); Whren v. United States, 517 U.S. 806, 815 (1996) (rejecting as basis for analyzing alleged Fourth Amendment violation that officers stopped the vehicle in violation of police regulations); Rose v. City of Mulberry, 533 F.3d 678, 680 (8th Cir. 2008) (holding that an officer who has probable cause, but was prohibited from making the arrest under state law, does not violate the Fourth Amendment).

Finally, the agents would have obtained and did obtain most of the e-mails at issue from the search warrant served on Yahoo, the validity of which Defendant does not challenge, and from their consent search of Defendant's laptop.

### B. Statements Made by Defendant

Defendant also seeks the suppression of his statements on the ground that the statements made following his arrest[2] were not knowingly and voluntarily made; were

---

[2] Defendant does not appear to make any Fifth Amendment argument related to the statements made during the monitored telephone conversations or e-mail exchanges prior to his arrival at the undercover residence. Miranda requirements, however, extend only to those who are in custody and who are interrogated by persons they know are acting on behalf of the government. See Ill. v. Perkins, 496 U.S. 292, 297 (1990). At the time of the communications, Defendant was in wholly separate location from any law enforcement officials, and was not, in any way, in custody. Nor was he subject to interrogation. As such, any Fifth Amendment challenge to the monitored telephone calls and e-mails would fail. See United States v. Ingle, 157 F.3d 1147, 1150 (8th Cir. 1998) (holding that Miranda warnings are not required for conversations between the defendant

12

made without advice of his rights under Miranda;[3] and were the result of an unlawful arrest. None of these arguments have merit.

A defendant may knowingly and intelligently waive his rights and agree to answer questions. Miranda v. Ariz., 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colo. v. Connelly, 479 U.S. 157, 168-69 (1986). The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it. Moran v. Burbine, 475 U.S. 412, 423-24 (1986). "A waiver is knowing if it is 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' . . . It is voluntary if it is 'the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" United States v. Syslo, 303 F.3d 860, 865 (8th Cir. 2002) (citation omitted) (quoting Moran, 475 U.S. at 421); accord United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (noting two distinct dimensions of the inquiry).

---

and two inmates who had been encouraged to elicit incriminatory statements).

[3] Miranda v. Ariz., 384 U.S. 436 (1966).

Further, the statement itself must be voluntary and not the product of any police conduct by which the defendant's will is overborne. Connelly, 479 U.S. at 170; Haynes v. Washington, 373 U.S. 503, 513 (1963). "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry." Dickerson v. United States, 530 U.S. 428, 444 (2000). As the Supreme Court has recognized, however, "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); see also Dickerson, 530 U.S. at 444.

Here, the officers advised Defendant of his rights prior to his making any statements at the scene, and Defendant knowingly and voluntarily waived his rights, both orally and in writing. At the time of these events Defendant was a 57-year-old adult, with sufficient education to hold the post of parish priest, and did not appear to be under the influence of any drugs or alcohol. No promises or threats were made to induce Defendant to waive his rights, nor was there any use of force, except as was reasonably necessary, initially, to secure Defendant's arrest. The request for waiver was made shortly after his arrest, and at the time Defendant was seated at a kitchen table, with only two officers present.

The government has also met its burden to establish that Defendant's statements were voluntary. "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically

14

impair his capacity for self-determination." United States v. LeBrun, 363 F.3d 715, 724 (8th Cir. 2004) (en banc) (quoting Simmons v. Bowersox, 235 F.3d 1124, 1132 (8th Cir. 2001). In determining voluntariness, the court examines the totality of the circumstances. Id. Relevant factors include the length of the detention, the repetitive and prolonged nature of questioning, the accused's age, and the questioning tactics. Simmons, 235 F.3d at 1133. Again, no threats or promises were made, or unfair questioning tactics used, to induce Defendant's statements. The questioning began immediately after Defendant's arrest, and lasted only 45 - 60 minutes. Prior to any questioning, Defendant was advised of his rights, and specifically advised that if he decided to answer questions without a lawyer present, he had the right to stop answering at any time. Govt. Ex. E. As such, the Court finds that Defendant's oral statements at the scene following his arrest were voluntary and that no basis exists for the suppression of his statements under the Fifth Amendment.

Defendant's further argument, that his statements must be suppressed as the direct result of an unlawful arrest also fail. Although the officers did not have a warrant for Defendant's arrest, they plainly had probable cause to arrest Defendant based upon his communications with the undercover officers, in which he arranged to have oral sex, for pay, with a girl he had been advised was only 16 years of age, and his appearance at the pre-arranged location where the sexual activity was to occur.

### C. Search and Seizure of Computer

Finally, Defendant challenges the warrantless search and seizure of his laptop. In

the context of a warrantless search, it is the prosecution's burden to prove by a preponderance of the evidence that a consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir. 1996); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994). The consent, however, need not necessarily be knowing and intelligent. Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). One need not be aware of his or her right to refuse consent in order to make the consent voluntary. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. Chaidez, 906 F.2d at 380-81. Voluntariness is a fact question to be determined from the totality of the circumstances present. Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1974). The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001); accord United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the

factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F2d at 381.

Applying the above factors, the government has met its burden to establish that the consent by Defendant was voluntary. There is nothing here to suggest that Defendant's will was overborne. United States v. Poulack, 236 F.3d 932, 936 (8th Cir. 2001); Miller, 20 F.3d at 930. On the contrary, the factors identified in Alcantar strongly weigh in favor of a finding of voluntariness. 271 F.3d at 737. Here, Defendant, then a 57-year-old adult, signed a written consent to search form. At the time he did not appear to be under the influence of any drugs or narcotics, and appeared to understand what was being said to him. Prior to requesting consent, the officers advised Defendant of his rights under Miranda. There were only two officers seated with Defendant at the time consent was requested, and the request occurred during the course of an interview that lasted no more than 60 minutes. No threats or promises were made to induce Defendant to consent, and the officers did not display their firearms or otherwise exert any force. Defendant

17

thereafter signed a written consent to search form, in which he was specifically advised of his right to refuse consent, and acknowledged that he was giving his permission voluntarily. Indeed, Defendant advised the officers of the specific location of the laptop, and the password necessary to access the information contained on the computer. Gov't Ex. D. As such, neither the seizure nor the search of the laptop is subject to suppression.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Statements [Doc. No. 23] be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Physical Evidence and Supplemental Motion to Suppress Physical Evidence [Doc. Nos. 24 and 36] be **denied**.

**IT IS FURTHER RECOMMENDED** that Defendant's Motion to Suppress Recorded Conversations [Doc. No. 25] be **denied**.

**IT IS HEREBY ORDERED** that Defendant's Supplemental Motion for Discovery [Doc. No. 49] is **denied as moot**.

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may

result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990).

/s/ Audrey G. Fleissig
AUDREY G. FLEISSIG
United States Magistrate Judge

Dated this 18th day of December, 2009.